## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| CHARLES C. BATES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:04cv008 |
| | ) | |
| JO ANNE B. BARNHART, Commissioner of | ) | Judge Thomas A. Wiseman, Jr. |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

Before the Court is Plaintiff Charles C. Bates' motion for judgment on the administrative record (Doc. No. 9), filed along with a supporting brief (Doc. No. 10), seeking reversal of the Commissioner's decision denying benefits. The Commissioner of Social Security ("Commissioner" or "Defendant") has filed a response opposing Plaintiff's motion (Doc. No. 11).

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's decision is not supported by substantial evidence and that the evidence in the record is sufficient for a finding of disability. Accordingly, Plaintiff's motion for judgment will be granted, the Commissioner's decision reversed, and the matter remanded for an award of benefits.

### I.    INTRODUCTION

Plaintiff filed this civil action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner, finding that Plaintiff was not disabled and denying his petition for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI").

Plaintiff filed his current applications for DIB and SSI on September 25, 2000 (Doc. No. 5, Attachment, Administrative Record ("AR") 57–78, 229–31), alleging that he became disabled on December 27, 1999 due to the residual effects of three cracked cervical vertebrae with constant neck and back pain, inability to grip with his right hand, loss of vision in his right eye, and a left leg injury incurred after the alleged onset date. (AR 66.) Plaintiff's applications were denied initially and upon reconsideration. (AR 31–32, 33–35, 36–40, 41–44, 232–38, 239–42.) Plaintiff requested and received a hearing. (AR 45, 24–27.) The hearing was conducted on July 9, 2002 before Administrative Law Judge ("ALJ") John P. Garner in

Cookeville, Tennessee. (See AR 243–69.) The ALJ issued a written decision denying Plaintiff's application on November 12, 2002. (AR 16–23.) The Appeals Council denied Plaintiff's request for review by letter dated November 25, 2003 (AR 5–7), thereby rendering the ALJ's decision the final decision of the Commissioner.

This civil action was thereafter timely filed, and the Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

## II.    FACTUAL BACKGROUND

Plaintiff was born December 8, 1970 and is classified as a younger individual. He completed the twelfth grade and has had no other training. (AR 247.) His past relevant work includes that of laborer, cook and factory worker. (AR 83, 258.) There is no doubt that Plaintiff has suffered significant physical trauma in his life. In 1990, he was in a motor vehicle accident that resulted in bilateral knee injuries. In 1994, he fell fifty feet off a bluff, sustaining facial fractures, a pelvic fracture, and dislocated knuckles of the right hand resulting in a permanent deformation of that hand, "with continual flexion of the fingers at approximately 40 [degrees]" and significantly reduced grip strength. (AR 1624.) He also had plastic surgery to repair the facial trauma. In addition, although the record does not indicate how, Plaintiff lost the vision in his right eye sometime in 1997 or 1998. (AR 263.) Plaintiff continued working after each of these incidents. He claims disability as a result of the combined effect of these prior injuries in addition to injuries incurred in subsequent vehicular accidents that occurred in December 1999 and August 2000, including three cracked cervical vertebrae and a broken rib or two, and a severe soft-tissue injury to his left thigh, discussed in greater detail below.

### A.    The Medical Evidence

Plaintiff's primary care physician from September 1999 through March 2001 was Dr. Welburne Johnson at the Strictly Medicine Clinic. Dr. Johnson's treatment notes reflect that in September 1999, Plaintiff reported low back pain and was diagnosed as having a right psoas muscle strain. Dr. Johnson noted that Plaintiff had a history of back problems. (AR 155.) He was prescribed Vicodin as well as Doxepin (an antidepressant) and Etodolac (an anti-inflammatory). Plaintiff followed up two weeks later and again was prescribed Vicodin. (AR 154.) About six weeks later he returned claiming he had strained his back the night before when he slipped while helping his brother push a truck out of the yard. (AR 154.) The prescriptions

2

for Vicodin and Doxepin were again renewed. (AR 154.)

Two weeks later, on December 27, 1999, Plaintiff was involved in a vehicular accident. He was initially admitted to Baptist Dekalb Hospital in Smithville where he was treated and stabilized before being transferred to Vanderbilt. The Baptist Dekalb records indicate Plaintiff suffered nondisplaced fractures of the cervical spine, C1, C6 and C7,[1] as well as the right first rib. He also suffered a collapsed lung, concussion with no loss of consciousness, broken nose, and multiple bruises and scratches. Alcohol was considered to be a factor in the accident. (See AR 118–37.) Other than the Patient Transfer Certificate (AR 137), there are no medical records in the Administrative Record from Vanderbilt pertaining to the December 1999 accident.

Just a few months later, around the end of March 2000, Plaintiff apparently had another car accident, albeit a relatively minor one. Dr. Johnson noted he "went to Vanderbilt, was told to see family [doctor]." (AR 153.) Dr. Johnson's diagnosis indicated Plaintiff had strained the muscle on his 6th and 7th vertebrae but had not sustained any further fractures. (Id.) About a week later, during a follow-up visit, Plaintiff reported continued pain and stiffness in his upper back. (AR 152.) Dr. Johnson noted Plaintiff had been "off meds" for two weeks. The other handwritten notes are largely illegible, though the doctor did state: "Explained non-admission status; p[atien]t accepts that I cannot place him in hospital. He will seek another MD who can admit. Jason Bates as witness." (AR 152.) There are no additional records indicating further treatment resulting from that alleged accident.

In a motorcycle accident on August 20, 2000, Plaintiff sustained a significant soft-tissue injury to his left thigh and laceration to his left knee. According to his medical records from Vanderbilt University Hospital (AR 139–45), the "soft tissue loss measured approximately 20.0 x 15.0 cm in size, and the laceration on the medial posterior knee measured approximately 15.0 cm in size." (AR 139.) Neurovascular function of the left foot was basically intact, and x-rays revealed no fractures or other "bony abnormality." (AR 139.) No structural instability of the knee was noted. (AR 142.) Nonetheless, Plaintiff received in-patient treatment from August 20 through September 5, 2000 for "wound vac therapy" (see AR 143), and underwent at least

---

[1]Specifically, he received fractures of the right transverse process of C1 and C7, and fractures of the posterior spinus process of C6 and C7. (AR 130.) Later x-rays indicate the C7 fracture ultimately became slightly displaced. (AR 209.)

two surgeries on the area, including plastic surgery for "soft tissue reconstruction," which involved a skin graft with skin harvested from his right thigh.  (AR 143; <u>see</u> AR 210–23.)

On follow up with plastic surgeon Ronald Barton, M.D., on September 14, 2000, Plaintiff's wounds were noted to be healing well and he was referred to orthopedic John Edwards, M.D. for physical therapy and further evaluation of knee function.  He was also given a prescription for Percocet (#30) and instructed to return "prn."  (AR 212.)  On follow up with Dr. Edwards on October 12, 2000, Plaintiff was noted to have full extension of his injured left knee and flexion to 90 degrees.  He was referred for physical therapy for range of motion, strengthening, and weight-bearing as tolerated.  At that appointment, Plaintiff complained to Dr. Edwards of neck and back pain related to his December 1999 accident and requested pain medication, for which he was referred to his primary care physician.  (AR 210.)

Medical records from Dr. Welburne Johnson's office dating from after the motorcycle accident indicate Plaintiff was complaining of "severe neck and shoulder pain x 10 months" on October 24, 2000.  Dr. Johnson's notes indicate "tender cervical spine posteriorly with no spasm."  The remainder of Dr. Johnson's notes are largely illegible, except for the diagnostic impression of "cervical strain."  (AR 151.)  On December 7, 2000, Plaintiff complained his back pain had increased over the previous  two weeks;  Dr. Johnson's impression this time was thoracic strain with muscle spasm.  (AR 150.)  In February 2001, Plaintiff again complained of neck and upper back pain "due to motorcycle accident."  (AR 198.)  He was assessed as having a cervical strain, lumbar strain and shoulder strain with muscle spasms.  (AR 196, 198.)

Plaintiff subsequently changed medical providers, apparently because of an issue with insurance.  Plaintiff's primary care provider from June 2001 at least through the date of Plaintiff's hearing before the ALJ was Nurse Practitioner Kim Rigsby in Dr. Charles Morgan's office.  (AR 203–09.)  At his initial visit in June 2001, Plaintiff complained to Ms. Rigsby of neck, left leg and back pain after "moving some furniture over the weekend."  He claimed to have tried Tylenol and Aleve without help.  He reported a history of "fracture to the c-spine," "injury from motorcycle accident," "chronic pain."  He was given prescriptions for three types of pain medication (Lortab 5mg, Cyclobenzaprine 10 mg, and Diclofenac 75 mg) and instructed to follow  up as needed.  (AR 207–08.)

A month later, Plaintiff presented with complaints of increased neck and upper back pain, claiming to have had problems with pain since his 1999 motor vehicle accident.  He reported having done no physical

therapy on his neck or back and had no recent x-rays, so Ms. Rigsby ordered x-rays and physical therapy. Lortab was prescribed again, along with Neurontin. The assessment was chronic pain syndrome. (AR 207.) Later in the month Plaintiff reported the Lortab was making him nauseated so Lorcet was ordered instead. He reported that physical therapy and the Neurontin appeared to be helping some but he also stated he was having increased stress with anxiety and insomnia. He had tried his father's Xanax and found it helped a lot. He was advised to seek activity outside the house and to get a mental health counselor to assist with treatment. (AR 206–07.)

In September 2001, Plaintiff complained of upper back pain since he had again helped a family member move furniture. He also reported some knee pain since the weather had gotten cold and damp, as well as feelings of anxiety, stating he "[s]its at home all the time – 'it gets to me.' " Objectively, Ms. Rigsby noted muscle spasms. He was continued on Lortab 7.5 mg, despite allegations it had made him nauseated two months prior, Neurontin, and Xanax. Carisoprodol was also added to the list. (AR 206.)

In November 2001, Plaintiff called thirteen days early for a refill of his Lortab prescription. The treatment notes indicate he refused alternative medications offered, including various NSAIDs. (AR 205.) A month later he continued to complain of pain and muscle spasm in his neck and anxiety. He also reported his Xanax was stolen over the weekend. He noted that he occasionally had to take more than two Lortab per day and, consequently, sometimes runs out of his prescription early. (AR 205.) Plaintiff reported that physical therapy was helping, but he had transportation problems since he did not drive. He also complained that he was unable to get a good night's sleep because of pain. (AR 205.) In March 2002, he continued to complain of anxiety, neck pain and low-back pain. He did not report any problems with use of his arms and no numbness or tingling. (AR 204.)

In addition to her treatment notes, there is a note in the record from Ms. Rigsby dated December 28, 2001 stating that in her opinion, Plaintiff is not able to work. (AR 225.) In addition, attached to Plaintiff's brief are two letters addressed "To Whom It May Concern" from Ms. Rigsby dated March 13, 2003 and January 1, 2004, reiterating Ms. Rigsby's opinion that Plaintiff is unable to work.[2] The Court will only consider the

---

[2]The latter note further adds that Plaintiff is not able to work "due to a variety of conditions: weakness and pain in his legs, inability to grip with his right hand, chronic back pain and short term memory loss." (Doc. No. 10, "Appendix.")

December 2001 note, as the later notes post-date the hearing and the ALJ's decision and therefore are not part of the Administrative Record.

**B.    Clinical Interview With IQ Assessment**

Mary Kay Matthews, L.P.E., performed a clinical interview with IQ assessment upon referral by examiner David Tidwell, on January 16, 2001. (AR 156–60.) Ms. Matthews assessed Plaintiff as meeting the criteria for alcohol dependence in sustained full remission. Plaintiff admitted alcohol dependence but reported he had not consumed alcohol since his accident in December 1999. He denied drug dependence. (AR 157.)

Plaintiff reported difficulty with his memory but was not assessed as having any difficulty thinking. He had a "sad affect" but no psychomotor disturbances; he denied hallucinations and delusions as well as obsessive, compulsive, bizarre, disruptive or hostile behavior. He also denied any suicidal or homicidal ideation. (AR 157.)

Plaintiff tested as having a full scale IQ score of 75, which places him in the borderline range of intellectual functioning. (AR 159.) Although he was noted not to have any difficulty following and understanding the instructions pertaining to the testing, Ms. Matthews stated:

> The examiner believes that Charles would be limited in his ability to handle simple and/or more detailed work-like procedures and instructions, remember locations and carry out these instruction[s]. Mentally, he could perform activities within his schedule, maintain regular attendance, and be punctual within customary tolerances. The claimant would be limited in his ability to sustain ordinary routine without special supervision and limited in his ability to maintain concentration. The examiner believed that Charles could work in coordination with or proximity to others without being distracted by them, and could make simple work-related decisions. . . . [H]e has the ability to complete a normal work day and work week without interruptions from psychologically based symptoms, and could perform at a consistent pace without an unreasonable number and length of mental rest periods. The claimant has the ability to interact appropriately with the general public and could ask simple questions and request assistance. Charles could accept instructions and respond appropriately to criticism from supervisors[.]

(AR 159.) The examiner also found Plaintiff had the ability to "respond appropriately to changes in the work setting, . . . be aware of normal hazards and take appropriate precautions. . . and could use public transportation. Also, the claimant has the mental ability to set realistic goals and make plans independently of others." (AR 160.) Based upon these findings, Ms. Matthews rated Plaintiff on the Global Assessment of Functioning Scale (GAF Scale) at 65. Finally, the examiner noted that if claimant could find relief from his pain, he might function at a higher level. (AR 160.)

6

C.    **Mental Residual Functional Capacity Assessment**

In a Mental Residual Functional Capacity Assessment form dated February 9, 2001, completed by Dr. Victor O'Bryan (AR 177–94), Plaintiff was assessed to be moderately limited in his ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, to complete a normal work-day and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods.  (AR 177–78.) He was considered mildly limited ("not significantly limited") in a number of other work-related areas.  Dr. O'Bryan noted that Plaintiff "can do some detailed work" and that his concentration and memory were "limited, but adequate."  (AR 179.)  With respect to intellectual functioning, Dr. O'Bryan assessed Plaintiff as having a sub-average general intellectual functioning in the borderline range (see AR 185), as well as "[p]athological dependence, passivity, or aggressivity" (AR 188) and behavioral or physical changes "associated with the regular use of substances that affect the central nervous system."  (AR 189.)  Consequently, he was assessed as having "mild limitations" in his activities of daily living and maintaining social functioning, and "moderate limitations" in concentration, persistence and pace.  (AR 191.)

D.    **Residual Functional Capacity Assessments**

Medical consultant Melvin L. Blevins, M.D., performed a medical assessment of Plaintiff, at Defendant's expense, on January 24, 2001.  (AR 161–68.)  At that time, almost exactly six months after his motorcycle accident, Plaintiff was still using a cane to walk.  He reported inability to work as a result of (1) loss of vision in his right eye; (2) back and neck pain; (3) loss of balance and pain in his left thigh and left knee; and (4) deformity of the right hand with decreased grip.  (AR 162.)

On physical examination, Dr. Blevins noted Plaintiff walked with a significant limp using a cane, had significantly decreased right hand grip strength and multiple scars from his various injuries.  Otherwise, spinal configuration and range of motion generally (except in left leg) were grossly normal.  There were no noted muscular spasms at that time but parathoracic and paracervical tenderness.  Cranial nerves C2 through C12 were found to be intact; deep tendon reflexes intact.  Straight-leg raising was negative.  However, Plaintiff was unable to perform heel-to-toe walking and Romberg test was "equivocal."  (AR 165.)

In the "Impressions" section of his report, Dr. Blevins noted Plaintiff's impairing conditions as follows:

1) S/P multiple injuries with extensive residual of anatomical defects

2) S/P injury right hand with severe functional limitation as described
3) S/P injury of left thigh with large soft tissue defect with marked functional limitations as described
4) Blindness right eye
5) Impaired gait requiring assistive device as described
6) Chronic lumbosacral strain
7) Anxiety
8) Depression with [history] of suicidal ideation
9) Questionable episode of psychosis with visual hallucinations as noted.[3]

(AR 166.) As a result of these limitations, Dr. Blevins assessed Plaintiff as "severely limited due to his multiple injuries" with "severe limitations of his right upper extremity." Functionally, Dr. Blevins believed Plaintiff able to lift occasionally no more than 10 pounds, with no frequent lifting, to stand less than 2 hours per day and perhaps as little as 15 minutes at a time, and to sit no more than 4 hours per day. (AR 166.) In other words, according to Dr. Blevins' assessment of Plaintiff's functional limitations, Plaintiff was unable to work full time, even at the sedentary level of exertion.

Dr. Shannon Tilley performed a Residual Functional Capacity evaluation based upon a review of Plaintiff's medical records just a week later, on February 2, 2001. (AR 169–76.) Dr. Tilley assessed Plaintiff as having the ability to lift 20 pounds occasionally, 10 pounds frequently, to stand or walk about 6 hours in an 8-hour workday (despite the fact that he was still walking with a cane), to sit about 6 hours in an 8-hour workday, to have an unlimited ability to push or pull (AR 170), but with manipulative limitations in handling (gross manipulation) and fingering (fine manipulation) (AR 172). Somewhat astonishingly, again given that Plaintiff was still using a cane to walk, Dr. Tilley stated that no postural limitations were established with respect to climbing, balancing, stooping, kneeling, crouching or crawling. (AR 171.) Plaintiff was found to be limited in his depth perception as a result of his right eye blindness, although he had 20/30 corrected vision in both eyes. (AR 173.) It is apparent that Dr. Tilley had reviewed Dr. Blevins' assessment in conducting her evaluation, but it is not clear upon what information she relied in reaching her conclusions regarding Plaintiff's functional limitations (or relative lack thereof).

### E. Testimony At the Hearing – Plaintiff

At the hearing held July 9, 2002, Plaintiff testified about his various accidents. He discussed his 1990 car accident in which he "crushed both [his] knees and froze [his] lungs, cut [his] liver, and cracked [his]

---

[3]The Court notes that barely a week earlier, Plaintiff denied to Dr. Matthews any suicidal ideation or hallucinations, as indicated above at page 5.

kidney." (AR 248.) He got stitches in his forehead and underwent surgery in his right knee to repair a tendon. He recovered after that accident and went back to work. (AR 248.) In 1994, he fell off a fifty-foot bluff, sustaining a broken jaw, crush fractures around his eyes, split muscles in his right hand, and a pelvic fracture. His right hand remained deformed after that accident, but he recovered sufficiently to go back to work about six months after that accident. (AR 249.)

Then, on December 27, 1999, he flipped his pick-up truck, cracking three vertebrae in his neck and two ribs, and sustained a collapsed lung. He has never gone back to work after this accident, and claims disability beginning on that date. Plaintiff admitted that he "might have been drinking a little" before that accident, but adamantly denied drinking at all after that date. (AR 251.)

Plaintiff then had a motorcycle accident in August 2000 in which he lost a "big chunk of [his left] leg." (AR 352.) Plaintiff stated that as a result of that accident, he can walk, but not very far. He does not get out of the house often or do much during the day. He testified that at the time of the hearing he lived with his mother, and that his mother saw to most of his needs and did all the cooking and cleaning. He stated that he is able to stand on his left leg "maybe 4, [sic] 20 minutes at a time." (AR 253.[4]) He alleged that he hurts all over, every day, particularly in his neck, upper back and knees. According to Plaintiff, medication helped alleviate the pain but did not completely eradicate it. He claimed the pain is much worse in cold or damp weather.

Plaintiff testified that the uncorrected vision in his right eye was 20/200. He stated he could not see anything straight ahead out of that eye and could see only a little through his peripheral vision. Plaintiff also claimed his short-term memory was diminished as a result of his various accidents. Further, Plaintiff is right-handed but has lost the grip in his right hand. He claims he is no longer able to play ball with his son or engage in other activities he used to enjoy.

Upon questioning by the ALJ, Plaintiff testified that he had lost the vision in his eye in 1997 or 1998. He admitted that his driver's license had been revoked for drinking and driving, and he was charged with driving on a revoked license in connection with his December 1999 accident. (AR 263.)

### F. Testimony At the Hearing – Vocational Expert

---

[4]The Court assumes that this is a typographical error in the transcript, and that Plaintiff stated he could stand "maybe [for] 20 minutes at a time."

Vocational Expert ("VE") Dr. Gordon Doss testified at the hearing that Plaintiff's past relevant work was all medium to heavy or very heavy, including his jobs as hand-packer, nursery employee, construction work, grinder, molding machine operator, and cook in a restaurant. Only his prior job as a machine feeder was classified as light, unskilled work.

The ALJ went over the findings of the psychological consultant Mary Kay Matthews, L.P.E., with the VE, including her findings as to some specific limitations as well as her opinion that Plaintiff was functioning at a GAF level of 65, meaning "according to the DSM-IV some mild symptoms, some difficulty in social, occupational, or school functioning but generally functioning pretty well." The ALJ asked the VE whether, given the consultant's assessment, Plaintiff could perform any of his past work. In response, the VE noted that he believed there were several inconsistencies in Dr. Matthew's evaluation. Primarily, in his understanding, if a person is assumed to be functioning at a global level of 65, then all of his past work would be available from an intellectual perspective. However, looking "at the other descriptors of psychological capabilities, in that form," according to the VE, only the jobs of hand packer or crew member at a nursery would be available. (AR 260.)

The ALJ posed a hypothetical situation to the VE, asking him to assume the ability to perform light work, with only occasional use of the right upper extremity for gross or fine manipulation; limited depth perception, and a GAF level of 65. (AR 260.) The VE responded that this person would need to stay out of the manufacturing setting in order to protect his remaining good eye, which eliminated the past work of machine feeder. The VE felt the available past work a person with those limitations could do would be that of hand-packing, though he could also do counter work or cashiering work. The ALJ reminded the VE that Plaintiff's past work as a hand-packer was characterized as medium work, but the VE stated that there are also light packing jobs available, approximately 5400 statewide. (AR 261.) The VE stated there were approximately 44,000 light cashiering jobs available within the state. In addition to the 5400 light packing jobs and 44,000 light cashiering jobs, the VE stated there were other light and sedentary jobs available, including about 628 sedentary dispatcher jobs statewide and, if the person could drive, 2168 newspaper vendors, and 2283 messengers. (AR 261–62.)

The ALJ then posed a second hypothetical to the VE, asking what jobs might be available to a person who was limited to sedentary work, could ambulate only with an assistive device, was limited in the ability

10

to crouch, kneel, crawl, and climb, limited fingering and manipulation with his dominant hand, decreased depth perception, difficulty operating pedals or controls with his left leg, and borderline mental functioning. The VE stated that, with the addition of the borderline intellectual functioning, the person would not even be able to work at dispatching and there were no jobs on the open labor market for a person with all those limitations.

### III.    THE ALJ'S FINDINGS

The ALJ found that the medical evidence established that Plaintiff had cervical and thoracic strain, residuals of injury to left lower extremity status post arthrotomy and skin graft, monocular vision, right hand deformity, and depression. He found these impairments, in combination, to be "severe" impairments within the meaning of the regulations, but not severe enough to meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, and Appendix I.

In reviewing the medical evidence in the record, the ALJ rejected Nurse Practitioner Kim Rigsby's opinion that the claimant was not able to work on the basis that it was unsupported by the record as a whole. He also noted that the statement was furnished at Plaintiff's request in response to a directive by a judge in connection with a hearing regarding child support payments. The ALJ also noted supposed inconsistencies in the mental functioning assessment provided by the consultative examiner, Dr. Mary Kay Matthews, and apparently elected to adopt her opinion that Plaintiff was functioning at a global GAF level of 65, while rejecting her more specific findings. The ALJ pointed out that Dr. Blevins' assessment was based upon an examination performed approximately four months after the motorcycle accident in which Plaintiff sustained the soft-tissue injury to his left leg. At that point, he was still walking with a cane. The ALJ observed that Plaintiff's condition continued to improve after that, such that at the time of the hearing he was no longer using a cane or other assistive device to walk. The ALJ rejected Dr. Blevins' opinion largely on that basis.

The ALJ noted that "[a]lcohol dependence was a major factor with 2 convictions for drunk driving," as a result of which Plaintiff's driver's license was revoked in 1998. He was charged after the accident in December 1999 with driving on a revoked license and is now "effectively housebound secondary to his driving record." (AR 21.) Although the Plaintiff denies any alcohol use since the December 1999 accident, the ALJ found the record to be "full of drug seeking behavior with Xanax and/or Lortab abuse, which discredits pain complaints credibility." (AR 21.) Further, the ALJ observed that Plaintiff owes child support

and therefore has little incentive to go back to work. From all of this in addition to his review of the medical record, the ALJ concluded that the record as a whole did not provide a basis for the degree of pain alleged. (AR 21.)

Consequently, the ALJ determined that Plaintiff retained the residual functional capacity to lift and/or carry ten pounds frequently and twenty pounds occasionally; to sit for six hours and to stand and/or walk for four hours in an eight-hour workday; to climb, balance, stoop, kneel, crouch, crawl, push, pull or reach occasionally, with a limited ability for gross or fine manipulation with the right hand; monocular vision with decreased depth perception; and moderate limitations in the ability to understand, remember, and carry out detailed instructions and in the ability to maintain concentration, pace, and persistence for extended periods of time. (AR 21.)

With respect to psychological and intellectual impairments specifically, the ALJ found Plaintiff to have a mild restriction in the activities of daily living; a mild limitation in maintaining social functioning; and moderate limitation in maintaining concentration, persistence and pace. Since he found that Plaintiff did not have a marked limitation in any areas of functioning nor repeated episodes of decompensation, the ALJ determined he did not meet any of the "B" or "C" criteria for mental impairments.

The ALJ found that Plaintiff's impairments prevented him from performing his past work, but found that the Commissioner had carried her burden of establishing that there was other work in sufficient numbers in the national economy that Plaintiff could perform, taking into consideration his age, educational background, work experience and residual functional capacity. Specifically, he found that the unskilled, light jobs that a person with Plaintiff's particular limitations could perform included: light hand-packer (5407 jobs in Tennessee); cashier (44,000 jobs); messenger ( 2283 jobs); and newspaper vendor (2168 jobs). Alternatively, the ALJ pointed to the VE's supposed finding that the limitations in the consultative examination would be consistent with the successful performance of a hand-packing job at the unskilled, light level of exertion. (AR 22.) Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act at any time through the date of his decision.

IV.     DISCUSSION

A.      Standard Of Review

Under the Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of

disability. The Act provides that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). This Court, therefore, is limited to determining whether substantial evidence supports the Commissioner's findings and whether the Commissioner applied the correct legal standards. See Abbott v. Sullivan, 905 F.2d 918, 922 (6th Cir. 1990). If substantial evidence supports the ALJ's conclusion, this Court cannot reverse the ALJ's decision even if substantial evidence exists in the record that would have supported an opposite conclusion. Youghiogheny & Ohio Coal Co. v. Webb, 49 F.3d 244, 246 (6th Cir. 1995). Substantial evidence is more than a scintilla of evidence, but less than a preponderance. See Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantiality is based upon the record taken as a whole. See Houston v. Sec'y of Health & Human Servs., 736 F.2d 365, 366 (6th Cir. 1984).

**B.    Evaluation Of Entitlement To Social Security Benefits**

Under the Social Security Act (the "Act"), Plaintiff is entitled to receive benefits only if he is deemed "disabled." 42 U.S.C. § 423(d)(1)(A). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In applying the standards for determining disability, the Secretary has promulgated regulations setting forth a five-step sequential evaluation process. See 20 C.F.R. §§ 404.1520 and 406.920. An ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. See id. The Sixth Circuit has summarized the steps as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and

13

vocational factors (age, education, skills, etc.), he is not disabled.

See Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 529 (6th Cir. 1997); 20 C.F.R. § 404.1520(b)-(f).  The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering her age, education, past work experience and residual functional capacity.  See Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990).

**C.     The ALJ's Finding Of No Disability At Step Five**

Plaintiff presents several issues for review:

(1) Whether the ALJ erred in finding that Plaintiff had the residual functional capacity to perform a limited range of light work;

(2) Whether the ALJ erred in failing to consider the combined effect of Plaintiff's multiple impairments;

(3) Whether the ALJ erred in rejecting the opinions of the Plaintiff's treating physician and the doctor who performed a consultative exam;

(4) Whether the ALJ erred in not finding the Plaintiff's testimony fully credible; and

(5) Whether the ALJ erred in finding that a significant number of jobs existed in the regional economy that Plaintiff could perform.

Plaintiff's first statement of error incorporates his next three statements of error as well, since he essentially contends that the ALJ erred in finding him capable of performing a limited range of light work, given his specific combination of impairments, the opinions of his treating physicians and consultative examiners, and his subjective complaints of pain.  A finding that the ALJ erred in reaching his conclusion that Plaintiff could perform a limited range of light work necessarily would lead to the conclusion that he erred as well in finding that a significant number of jobs existed in the national or regional economy that Plaintiff could perform.

In response, the Commissioner argues that the ALJ's findings as to Plaintiff's exertional capabilities are supported by and consistent with the medical and non-medical evidence in the record.  For instance, although he did suffer cervical fractures, the Commissioner argues that none of those fractures was displaced and there was no evidence of neurological impairment resulting therefrom.  Dr. Blevins noted Plaintiff had "grossly normal" spinal configuration with no muscle spasms; negative straight leg raising bilaterally and no positive neurological findings.  On March 20, 2002, Plaintiff reported to Ms. Rigsby that he had no problem

14

with the use of his upper extremities, despite claims of neck and back pain. With respect to the motorcycle injury, Plaintiff did not suffer any structural damage to his knee and, despite the severe loss of soft tissue in his thigh. While blind in one eye, he nonetheless had corrected bilateral vision was 20/30. As for his mental abilities, the psychological examiner noted no problems in Plaintiff's ability to think or relate to others, and his global functioning GAF score of 65 indicated mild symptoms of difficulty in social, occupational or school functioning, "but generally functioning pretty well." (AR at 259, quoting the DSM-IV at 32.) In addition, Plaintiff reported to Ms. Matthews that he helped with household tasks, cared for his dogs, watched television, read a lot, was occasionally was able to visit friends and relatives. The Commissioner claims Plaintiff also "took walks," though Plaintiff actually reported, in response to a question about the activities he does outside the home, that he "walked around a little, until [his] leg gets tired." (AR 107.) Finally, Defendant points out that Plaintiff's medical records indicate that he reported exacerbation of his back injury caused by allegedly helping to move furniture in June 2001 and September 2001.

The Commissioner's arguments notwithstanding, the Court finds the ALJ's determinations with respect to Plaintiff's residual functional capacity and limitations are not supported by substantial evidence, and that Plaintiff is not capable of performing light or sedentary work given his cognitive limitations and the cumulative effects of at least three serious vehicular accidents plus his fall from a fifty-foot bluff in 1994. In particular, the Court agrees with Plaintiff that the ALJ erred in rejecting Dr. Blevins' and Ms. Rigsby's opinions that Plaintiff is not capable of working even at the sedentary level, and in discounting Plaintiff's subjective complaints of pain. Perhaps most importantly, however, the Court finds that the ALJ erred in finding there were any jobs in the national or regional economy that Plaintiff could perform, given the VE's testimony at the hearing and the undisputed evidence in the record that Plaintiff is at the borderline level of intellectual functioning with a full-scale IQ of 75. This issue will be addressed first, below.

### (1)  Plaintiff's Ability to Work

The ALJ determined at step four of the sequential analysis that Plaintiff was unable to perform any of his past relevant work. (AR 23.) He then concluded at step five that there was a significant number of other jobs in the national economy that Plaintiff could perform. There is no dispute that the Commissioner has the burden at step five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. Moon v. Sullivan, 923

F.2d 1175, 1181 (6th Cir. 1990).

During the hearing, in response to the ALJ's first hypothetical, the VE stated his opinion that there were several different types of jobs that existed in significant numbers that a claimant with the specific limitations delineated could perform.  The ALJ then posed a second hypothetical to the VE in which he asked the VE to assume that the claimant was "limited to sedentary [work]; ambulate with an assistive device; limited in the ability to crouch, kneel, and crawl, and climb; limited fine fingering and manipulation . . . with the dominant hand; decreased depth perception; probably going to have difficulty operating foot pedals or controls with the lower left extremity; and . . . borderline mental functioning."  (AR 262.)  In response to this hypothetical, the VE responded:  "Your Honor, I would not be able to find a job, if we throw in the borderline intellectual functioning, it would be very difficult to find a dispatcher job with all the other limitations. . . .  I would not be able to find work in the open labor market for a person with those limitations."  (AR 262.)

In other words, the significant limiting factor and the only real difference between the first and second hypotheticals was the assumption that Plaintiff had borderline intellectual functioning.  In fact, the undisputed evidence in the record establishes that Plaintiff is "in the borderline range of intellectual functioning."  (AR 159; see also Exhibit 8F and 9F, AR 177–79, 181, 185, 191, 193.)  Both Mary Kay Matthews, L.P.E., and Victor O'Bryan, Ph.D., the state consultant whose assessment the ALJ specifically adopted (see AR 21), agreed on that point.  Because there is no evidence in the record that contradicts the VE's testimony, the VE's response to the ALJ's second hypothetical established that there are no jobs in the economy that a person with Plaintiff's physical and cognitive limitations could perform, even assuming that he otherwise would have been physically capable of performing work at the light or sedentary level which, as discussed below, is questionable at best.

The ALJ seemed to reject the finding that Plaintiff had a functional IQ of 75 based upon Mary Kay Matthews' assessing him on the GAF scale at 65, which the VE considered to mean, in accordance with the DSM-IV, "some mild symptoms, some difficulty in social, occupational, or school functioning but generally functioning pretty well."  (AR 259.)  There is no indication in the record, however, that a GAF level of 65 is inconsistent with an IQ of 75.  In the Court's understanding, GAF measures social functioning while the IQ test measures intellectual functioning.  The Court therefore finds that the ALJ erred in rejecting the VE's response to his second hypothetical, and in concluding that there was any work in the national or regional

economy that Plaintiff could perform given his functional limitations.

### (2) The ALJ erred in rejecting the opinions of Nurse Practitioner Kimerly Rigsby and consultative examiner Dr. Melvin Blevins.

As set forth above, Dr. Melvin Blevins performed a consultative examination of Plaintiff in which he determined that Plaintiff was able to lift occasionally no more than ten pounds, with no frequent lifting, to stand less than two hours per day and perhaps as little as fifteen minutes at a time, and to sit no more than four hours per eight-hour workday. (AR 166.) In other words, if Dr. Blevins' findings are adopted, they compel the conclusion that Plaintiff is not physically capable of performing full-time work at any exertional level.

The ALJ rejected Dr. Blevins' RFC assessment solely on the basis of the ALJ's finding that the "examination [was] performed approximately 4 months following the injuries to the left lower extremity" (AR 21) (actually it was six months), and that Plaintiff's leg continued to improve after that date such that he no longer needed to walk with a cane. The ALJ stated that he accepted instead the opinions of the state agency consultants regarding Plaintiff's residual functional capacity (exhibits 3F and 7F), as "consistent with and supported by the record as a whole." (AR 21.) On the contrary, the Court finds that the referenced opinions are insufficiently supported and do not constitute adequate evidence to support the ALJ's decision.

More specifically, Exhibit 3F is a cryptic "Analysis By DOS Medical Consultant" performed barely two months after Plaintiff's motorcycle accident. It simply states that Plaintiff had impairments that were "severe now but will improve to non-severe within twelve months" (AR 146), but further found the record "[t]echnically insufficient" to make a determination of disability. (AR 147.) Exhibit 7F is the RFC performed less than two weeks after Dr. Blevins' assessment, in which Dr. Shannon Tilley found that Plaintiff could stand and walk approximately six hours (each) in an eight-hour workday and had no postural limitations, despite the fact that Plaintiff was still using a cane for walking at that point. (AR 170–71.) Dr. Tilley did not explain how she reached a dramatically different conclusion than Dr. Blevins only a week after his examination of Plaintiff.

In fact, the Court finds that both of the opinions adopted by the ALJ amount to nothing more than unsupported speculation that Plaintiff might get better in the future. The ALJ's reliance on these assessments is misplaced, inasmuch as neither assessor actually examined the Plaintiff, and the reports do not indicate upon what evidence the consultants relied. Certainly there is no evidence that the consultants took into

17

account all the objective medical evidence in the record or Plaintiff's subjective complaints of pain. Cf. Barker v. Shalala, 40 F.3d 789, 794 (6th Cir. 1994) (a non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians). Likewise, the ALJ's determination that Plaintiff was capable of sitting about six hours and walking or standing about four hours in an eight-hour workday was speculation not based upon any concrete evidence in the medical record.

Further, the Court also finds the ALJ erred in rejecting treating practitioner Kimerly Rigsby's opinion that Plaintiff was disabled from working. Specifically, as Plaintiff points out, if a treating source's medical opinion is well supported and not inconsistent with other substantial evidence in the case record, it must be given controlling weight. Plaintiff argues that the ALJ erred in failing to give such controlling weight to the opinion of nurse practitioner Kim Rigsby, who, under the auspices of Charles D. Morgan, M.D., treated claimant from June 2001 through the date of the ALJ's decision. As Plaintiff argues, Ms. Rigsby had "certainly . . . obtained a detailed longitudinal picture of [Plaintiff's] impairments" such that the ALJ should have given greater weight to her opinions than to those of state agency consultants who never treated or examined Plaintiff. (Doc. No. 10, at 13.)

Clearly, an ALJ is "not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them." Hall v. Bowen, 837 F.2d 272, 276 (6th Cir. 1988). In addition, the Social Security Regulations provide that a "statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." 20 C.F.R. §§ 404.1527(e)(1) and 416.927(e)(1).

Here, the ALJ noted that he was rejecting Ms. Rigsby's opinion regarding Plaintiff's ability to work because it was not supported by the record as a whole and, in large part, because the opinion was presented in the form of a conclusory statement furnished by the Plaintiff in response to a directive by a judge in connection with a hearing regarding child support payments. Notwithstanding, although Ms. Rigsby's subsequent letters reiterating the same opinion are not admissible, the fact that she continued to hold the same opinion renders suspect the ALJ's rejection of the opinion on the basis that it was merely submitted for the purpose of excusing Plaintiff from child-support payments. Moreover, the medical record supports Ms. Rigsby's assessment of chronic neck and back pain, leg pain and weakness, inability to grip with the right

18

hand, short-term memory loss and anxiety, all of which, particularly in combination with Plaintiff's borderline intellectual functioning, are sufficient to support a finding of disability.

Finally, the only assessments in the record that contradict Ms. Rigsby's and Dr. Blevins' assessments that Plaintiff was not capable of performing full-time work are those of the agency consultants discussed above, which do not, under the circumstances, constitute substantial or significant evidence. Thus, because Ms. Rigsby's opinion is not contradicted by evidence that qualifies as "substantial," the ALJ did not have a reasonable basis for rejecting it. The assessments of Ms. Rigsby and Dr. Blevins therefore should have been accorded controlling weight, and the ALJ's decision to reject them was error. See, e.g., Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985) (a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor);

### (3) The ALJ erred in rejecting Plaintiff's subjective complaints of pain.

Plaintiff argues that the ALJ did not properly evaluate Plaintiff's subjective complaints of pain in light of the Social Security Act and Sixth Circuit opinions applying it, because the only basis the ALJ provided for rejecting Plaintiff's allegations of pain was his alleged drug-seeking behavior.

In Duncan v. Secretary of Health & Human Services, 801 F.2d 847, 853 (6th Cir. 1986), the Sixth Circuit established the criteria for evaluating a disability claimant's complaints of pain:

> First, we examine whether there is objective medical evidence of an underlying condition. If there is, then we examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such severity that it can reasonably be expected to produce the alleged pain.

The Social Security Administration has further elaborated that, "once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities." Soc. Sec. Ruling 96-7p, 1996 WL 362209, 61 F.R. 34483-01, at *34485 (July 2, 1996). If an individual's statements about pain are not substantiated by the objective medical evidence, then the ALJ must consider all of the evidence in the record, including any statements by the individual and other persons concerning his symptoms, to reach a finding on the credibility of the individual's statements about his pain symptoms and their functional effects. Id. The Sixth Circuit has consistently held that an ALJ's evaluation

of a claimant's credibility is entitled to considerable deference. See, e.g., Sizemore v. Sec'y of Health & Human Servs., 865 F.2d 709, 713 (6th Cir. 1988); Hardaway v. Sec'y of Health & Human Servs., 823 F.2d 922, 928 (6th Cir. 1987). Further, the mere fact that an underlying condition exists does not necessarily dictate a conclusion that the symptoms thereof, including pain, are disabling. Duncan, 801 F.2d at 853.

In this case, the ALJ clearly placed too much emphasis on Plaintiff's past history of alcohol abuse and questionable evidence of medication-seeking behavior, which is the only basis the ALJ gave for discrediting the Plaintiff's allegations of pain, besides his statement that "[t]he record as a whole does not provide a basis for the degree of pain alleged." Notwithstanding, the Court finds that the degree of repeated physical trauma endured by Plaintiff clearly was objectively capable of producing the chronic pain Plaintiff purported to suffer, and the relatively frequent mentions of muscle spasms in the medical records provide further objective evidence of musculoskeletal pain. None of his treating physicians questioned the degree of pain that Plaintiff reported suffering. Further, it is not unreasonable for a person who is in pain to seek medication to alleviate that pain. Behavior that the ALJ characterized as "medication-seeking" could just as easily be construed as evidence of pain itself. Given that the objectively established injuries incurred by Plaintiff were capable of producing the pain reported, the ALJ was required to evaluate the intensity, persistence or limiting effects of the pain. The Court finds that the ALJ erred in failing in failing to perform this type of evaluation and, consequently, in failing to articulate a reasonable basis for rejecting Plaintiff's subjective complaints of pain.

### (4)    *Whether Remand For Further Proceedings Is Required.*

As the Court has determined that the ALJ erred in reaching his conclusions, the remaining question is whether further proceedings are needed. Where the Commissioner's decision is not supported by substantial evidence but the record also does not contain sufficient evidence of disability to warrant an award of benefits, a post-judgment remand for further proceedings under sentence four of 42 U.S.C. § 405(g) is appropriate. Faucher v. Sec'y of Health & Human Servs., 17 F.3d 171 (6th Cir.1994); Melkonyan v. Sullivan, 501 U.S. 89, 97–98 (1991). In Mowery v. Heckler, 771 F.2d 966 (6th Cir. 1985), the plaintiff sought Social Security disability insurance benefits, which were denied at the agency level, and he did not prevail in the district court. He suffered from hypertension, headaches and dizziness, and aches and pains. He was forced to stop work as a construction laborer because of pain. He had worked several years earlier as a night

20

watchman. His IQ was below-average. Psychological tests established that the plaintiff was able to function only in construction and mining jobs, and an orthopedic examination showed that the plaintiff had limitation in movement which precluded that activity. The ALJ had denied benefits, concluding that the plaintiff could perform light work, such as that of a night watchman, although there was evidence in the record that the plaintiff had suffered a hearing loss and could only perform as a night watchman when assisted by his son and daughter. The court of appeals reversed the district court and remanded the case to the agency for an award of benefits, stating:

> The court finds it unnecessary to remand the case to the Secretary for further evaluation. In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking.

Id. at 973.

Generally, then, where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. DeGrande v. Sec'y of Health & Human Servs., 892 F.2d 1043, 1990 WL 94 (6th Cir.1990) (unpublished, available on Westlaw). Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." Faucher, 17 F.3d at 176. The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. Id. See also Felisky v. Bowen, 35 F.3d 1027, 1041 (6th Cir. 1994); Mowery, 771 F.2d at 973.

Here, the ALJ denied benefits at step five rather than step four, and the Court finds that an adequate record exists in this case demonstrating that Plaintiff is disabled within the meaning of the Social Security Act. This conclusion is based on the medical evidence discussed above, the plaintiff's testimony, which the Court finds should not have been rejected as incredible because the ALJ's reasons for doing so are not supported by substantial evidence, and the VE's testimony that there is no work in the national economy for a person with Plaintiff's established impairments.

## V. CONCLUSION

For the reasons set forth above, the Court finds that the ALJ's decision is not supported by

substantial evidence, and that the record supports a finding that Plaintiff is disabled within the definition of the Social Security Act. Accordingly, the Court will reverse the Commissioner's decision denying benefits and remand for an award of benefits based upon a disability date of August 20, 2000. The Court observes that Plaintiff will need assistance in managing the benefits awarded, given his borderline intellectual functioning and past history of alcohol dependence.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge